UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:20-cr-95 (VAB) |
| WILLIAM ROSARIO LOPEZ. | |

RULING AND ORDER ON MOTION *IN LIMINE*

William Rosario Lopez ("Mr. Lopez") has been charged in a ten-count Second Superseding Indictment charging him with crimes related to alleged armed robberies and unlawful possession of a firearm. *See* Second Superseding Indictment, ECF No. 271 (March 18, 2025) ("Second Superseding Indictment").

In advance of trial, Mr. Lopez has filed a motion *in limine* to exclude expert testimony regarding certain DNA evidence. Mot. *in limine* to Exclude DNA Evidence and for Daubert Hearing, ECF No. 261 (Feb. 21, 2025); Mem. In Supp. Of Mot. *in limine*, ECF No. 261-1 (Feb. 21, 2025) ("Mot").

For the following reasons, the motion *in limine* is **GRANTED in part and DENIED in part**.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

The Court assumes familiarity with the factual and procedural history of the case and includes only events relevant to the motion at issue here. *See* Ruling and Order on Mot. for Joinder, ECF No. 228 (Sept. 3, 2024).

A.  **Alleged Armed Robberies**

Mr. Lopez is accused of committing several robberies at gas stations across Connecticut between March 18, 2020 and March 26, 2020. *See* Second Superseding Indictment. Specifically,

Mr. Lopez is charged with robbing a Shell Gas Station in Vernon, a Fleet Gas Station in Southington, a Shell Gas Station in Waterbury, and a Citgo Gas Station in New Britain, and with attempting to rob a Shell Gas Station in Ansonia. *Id.* ¶¶ 1, 3, 5, 7, 8.

### B. DNA Evidence

Investigators collected DNA evidence from the scenes of the Vernon, New Britain, and Ansonia robberies that was analyzed by the Connecticut Forensic Laboratory ("State Lab"). Mot. at 2–3. The State Lab's testing eliminated Mr. Lopez as a contributor to the DNA mixtures from the samples collected at the Vernon and New Britain robberies. *Id* at 2; Exhibit H, ECF No. 261-2 at 243–46. The State Lab's testing of a latex glove left at the scene of the Ansonia robbery, however, linked his DNA profile as a contributor. Mot. at 2; Exhibit I, ECF No. 261-2 at 250–52. The State Lab processed the latex glove for testing through swabbing the exterior of the glove, item 001-005, and the exterior of the glove, item 001-006. Mot. at 3; Exhibit I, ECF No. 261-2 at 250–52.

The samples retrieved from the gloves were complex mixtures, meaning that more than three individuals were believed to contribute DNA to each sample. Mot. at 5; *see* Def. Exhibit 12, National Institute of Standards and Technology ("NIST"),[1] *DNA Mixture Interpretation: A NIST Scientific Foundation Review* (Dec. 2024) ("NIST Dec. 2024 Article") at 7, Exhibit D, ECF No. 261-2 at 43 ("A 'complex' DNA mixture sample is one in which uncertainty exists in the genotype assignments at tested STR loci in a DNA profile, which is more likely to occur in samples with three or more contributors"). The State Lab analyzed the DNA evidence from the glove using a "probabilistic genotyping program" called STRmix[TM] ("STRmix"). Mot. at 6. STRmix "models the probability of a profile given different scenarios provided by the analyst." *Id.* To use STRmix,

---

[1] "The NIST, an agency of the U.S. Department of Commerce, conducts studies to review the scientific bases of forensic methods." *United States v. Russell*, No. 22-50056, 2024 WL 4054382, at *1 n.1 (9th Cir. Sept. 5, 2024).

an analyst must input what the analyst believes to be the most likely number of contributors ("NOC") in the DNA profile being considered. *Id.* According to the State Lab's Standard Operating Procedures ("SOP") at the time, "DNA analysts [] use their professional judgement to assess the number of contributors." *See* Def. Exhibit 2 at 10; Exhibit F, ECF No. 261-2 at 230 ("SOP"). STRmix then generates a "likelihood ratio" ("LR") which "assesses the probability of the evidentiary profile given two alternate (mutually exclusive) hypotheses," namely, the hypothesis "where the data is explained by an inclusion of the person of interest" versus the hypothesis "where the data is explained by a person selected at random from the general population." SOP at 15, ECF No. 261-2 at 235. Under the State Lab's SOP, STRmix should not be used when the sample is believed to have more than four contributors. Mot. at 7; SOP at 13, ECF No. 261-2 at 233; *see also United States v. Ortiz*, 736 F. Supp. 3d 895, 900 (2024) ("Most labs have only validated STRmix's use in samples where NOC is four or less." (citing Austin Hicklin et al., *Variation in assessments of suitability and number of contributors for DNA mixtures*, 65 FORENSIC SCI. INT'L: GENETICS 5 (2023))).

STRmix "has garnered wide use in forensic laboratories across the country" and "numerous courts have admitted STRmix over challenges to its general acceptance in the relevant scientific community." *United States v. Gissantaner*, 990 F.3d 457, 466 (6th Cir. 2021) (collecting cases); *see also United States v. Green*, No. 22-3217, 2024 WL 4488577, at *2 (2d Cir. Oct. 15, 2024) (summary order), *cert. denied*, No. 24-6323, 2025 WL 581807 (U.S. Feb. 24, 2025) ("As one of our sister circuits has pointed out, STRmix is widely used 'in forensic laboratories across the country' with '[m]ore than [forty-five] laboratories us[ing] it, including the [Federal Bureau of Investigation ('FBI')] and many state law enforcement agencies.'" (citing *Gissantaner*, 990 F.3d at 466) (alterations in original))

*1. NOC Determination Generally*

The court in *United States v. Ortiz* provided the following overview of how analysts

estimate the NOC used in STRmix:

> STRmix relies entirely upon the analyst to determine NOC. Analysts determine
> NOC by looking at an electropherogram, a graphical representation of DNA sequencing—
> essentially a genetic fingerprinting. DNA analysis considers spots on the human genome,
> called loci, which contain segments of DNA and vary significantly from one person to
> another. The alleles are depicted on electropherograms as peaks. While a fingerprint may
> have countless ridges, at any DNA locus a person has only two alleles. One allele is
> inherited from each parent.
>
> Because a person has only two alleles at any locus, analysts determine NOC by
> counting up the number of alleles—which present as peaks on the electropherogram—and
> dividing by two. A sample that displays six allelic peaks, for instance, likely has a NOC of
> at least three.
>
> This seemingly straightforward analysis is complicated by the electropherogram's
> capacity for generating false information, which often leads analysts to either overestimate
> or underestimate NOC. For instance, electropherograms can generate fake peaks, which
> analysts refer to as "artifactual peaks." Artifactual peaks may be generated for a variety of
> reasons, including simple machine fluctuation or "stutter," a phenomenon where a real
> peak is surrounded by fake ones. If an analyst incorrectly considers an artifactual peak in
> their analysis, they run the risk of overestimating NOC.
>
> On the other hand, electropherograms may also lead an analyst to underestimate
> NOC. This can occur where the electropherogram fails to detect an allele. This
> phenomenon, called allelic dropout, occurs when the DNA sample is small and the
> undetected allelic contribution, minimal. . . . Underestimation can also occur as a product
> of allele sharing. Though alleles are highly variable between individuals, it is possible for
> two people to share one or both alleles at any particular locus. Where this occurs, the shared
> alleles overlap on the electropherogram creating the impression of a single peak where two
> peaks have merged, which may lead an analyst to undercount the total number of alleles.

736 F. Supp. 3d at 898–99 (citations omitted).

Regarding allelic dropout, "stochastic variation, . . . impacts recovered quantities of alleles

from contributors and can lead to uncertainty in assigning alleles to genotypes and uncertainty in

assigning genotypes to contributor profiles when examining small amounts of DNA." NIST Dec.

2024 Article at 7; ECF No. 261-2 at 43. Put simply, "[d]ata falling below . . . a stochastic threshold,

may be deemed not usable." Def. Exhibit 11, NIST, *Forensic DNA Interpretation and Human*

*Factors: Improving Practice Through a Systems Approach* (May 2024) ("NIST May 2024

Article") at 10. "[A] Stochastic Threshold is defined as the 'value above which it is reasonable to assume that allelic dropout has not occurred within a single-source sample.'" SOP at 7; ECF No. 261-2 at 227 (citation and emphasis omitted). The State Lab's stochastic threshold for the samples at issue here is 500 RFU. *Id.*; April 1, 2025 Tr., ECF No. 281 ("Apr. 1 Tr.") at 79.

The State Lab's SOP in effect during 2020 required analysts to use the following steps to determine the NOC of a DNA profile:

1. Review the profile as a whole, assessing the level of degradation, presence of low level peaks, noisy or clean baseline and general quality (template) of the profile.
2. Identify likely stutter peaks (both forward and back) by reference to DSS allele stutter ratio (SR) expectations (plots of SR per each allele).
3. Find the locus with the highest number of unambiguous allelic peaks, A. If A is an odd number, add 1. A/2 gives the initial assessment of the number of contributors to the profile.
4. Review peak height imbalances at the most informative locus (greatest number of alleles). Taking into account potential allele sharing among contributors, visually attempt to 'pair' alleles and assign them to contributors. If there is too much imbalance between alleles, this may mean the presence of an additional contributor(s) above that indicated by allele count alone. Refer to figure 1 for an indication of expected heterozygote balance at varying peak heights.
5. If one or more contributors at this locus are either minor or a clear major, check that this pattern is represented at other loci.
6. Apply the general pattern of contributors (number and proportion) to other loci in the profile. If it holds, assign this number of contributors to the profile; otherwise consider the addition or subtraction of one.
7. Analysts may utilize the Contributor Estimator Macro to assist in determining the number of contributors to a profile.

SOP at 10–11, ECF No. 261-2 at 230–31.

The "Contributor Estimator Macro" ("NOC Macro") is a Microsoft Excel spreadsheet tool that predicts the number of contributors to a DNA profile based on the number of alleles that the analyst determines is present at each locus of the profile. Mot. at 6–7. The NOC Macro is a tool for analysts that is meant to address the issue of allele sharing. April 8, 2025 Tr., ECF No. 287 ("Apr. 8 Tr.") at 151–52 ("Q. . . . [W]hy did you need the macro? A. Well, . . ., because there are other issues in play that cannot be adequately addressed by just the . . . maximum allele count.

And, in particular, there is the issue of coincidental allele sharing in the general population. . ., the DNA unit recognized this was an important factor and so we worked collectively to develop an additional tool to address this issue of coincidental allele sharing."). The NOC Macro, however, does not account for allelic dropout. Apr. 1 Tr. at 24 ("Q. So, to be clear, the macro that you used back in 2020 does not account for dropout? A. That's correct."); Apr. 8 Tr. at 152. The instructions for using the NOC Macro directs analysts to "[d]elete the allele count for any locus where dropout is expected to be happening . . . If dropout is expected at most loci, there is no need to run the macro as this tool will not likely add value beyond visual examination." Def. Ex. 7.

### 2. NOC Determination of Items 001-005 and 001-006

The analyst testing the glove collected from the Ansonia robbery, Mr. Steven Bryant, determined that each sample had a NOC of four contributors. Exhibit I, ECF No. 261-2 at 252. At the Daubert hearing, the Government's expert, Mr. Bryant, testified that in making his NOC determination, he consulted the electropherograms for items 001-005 and 001-006. He stated that he first reviewed the locus where the highest number of alleles were detected, FGA, and because seven alleles were detected at that locus, he determined the samples had at least four contributors. Apr. 1 Tr. at 32–33. Mr. Bryant testified that the information from this locus "[i]n and of itself, doesn't show definitely that this is [a] four-person [mixture], but it's sort of the starting off point which then allows you to go back and review the rest of the locations." Apr. 1 Tr. at 32. He further testified that "evaluating the specific peak heights, looking at the general overall profile, you can determine sort of the proportions of different possible mixtures in the mixture somewhat subjectively," and that he "would have gone back through all the other different locations looking for evidence of more than four contributors." Apr. 1 Tr. at 52–53. Mr. Bryant stated that he accounted for allelic dropout and the fact that certain alleles may have been below the stochastic

threshold, as well as for stutter peaks, in making his NOC determination. Apr. 1 Tr. at 50–51. Mr. Bryant also testified that he ran the NOC Macro and did not delete any loci, although he "didn't rely on the macro to make [his] assessment." Apr. 1 Tr. at 95.

After assuming four contributors, Mr. Bryant concluded that "the DNA profile is at least 100 billion times more likely to occur if it originated from William Rosario Lopez and three unknown individuals than if it originated from four unknown individuals" as to both samples. Apr. 1 Tr. at 29–30.

Mr. Lopez, however, alleges that "at least five contributors, not four, is the best interpretation for each of the two mixed samples." Mot. at 8. Mr. Lopez's DNA expert, Dr. Carll Ladd, contends that the DNA samples at issue here "have a high probability of allele drop out with numerous alleles observed below the DSS stochastic threshold." Exhibit K ("Ladd. Decl."), ECF No. 261-2 at 269, ¶ 7. He contends that 67.1% of alleles detected in item 001-005 and 59.5% of alleles detected in item 001-006 fall below the DSS's stochastic threshold. *Id.* He also claims that 87.5% of contributor profiles "were generated from less than 100pg of DNA," and that "100pg is the low-template value which is recognized to result in enhanced peak and stutter variance." *Id.* He alleges that "the Excel macro used by DSS in this case assumes that no allele drop out has occurred in the profile" and because "drop out is likely, additional analysis is needed to avoid/minimize NOC underestimation." *Id.* at 269, ¶ 8.

Dr. Ladd also claims that "[t]he STRmix weights in this case also demonstrate support for some peaks which were removed by DSS stutter filters being true alleles" and "such peaks were not considered by the contributor estimator macro since they had already been removed by the GeneMarker DNA analysis software." *Id.* at 269, ¶ 9. Dr. Ladd concludes that "due consideration

of the profile results, the average number of alleles expected at each locus as contributor number increases—all clearly indicate at least 5 contributors for both" samples. *Id.* at 270, ¶ 11.

### C. Procedural History

On February 21, 2025, Mr. Lopez filed a motion *in limine* to exclude opinion testimony regarding certain DNA testing under Federal Rules of Evidence 403 and 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Mot.

On March 7, 2025, the United States of America (the "Government") filed a motion in opposition to Mr. Lopez's *Daubert* motion. Mem. In Opp'n, ECF No. 266 (Mar. 7, 2025) ("Opp'n").

On March 14, 2025, Mr. Lopez submitted a reply in support of his *Daubert* motion. Reply, ECF No. 267 (Mar. 14, 2025) ("Reply").

On April 1, 2025 and April 8, 2025, the Court held a *Daubert* hearing. Min. Entry, ECF No. 278; Min Entry, ECF No. 288.

## II.    STANDARD OF REVIEW

Motions *in limine* provide district courts with the opportunity to rule in advance of trial on the admissibility and relevance of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n.2 (1984); *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce*, 469 U.S. at 41 n.4).

A court should exclude evidence on a motion *in limine* only if the evidence is "clearly inadmissible on all potential grounds." *Levinson v. Westport Nat'l Bank*, No. 3:09-cv-1955 (VLB), 2013 WL 3280013, at *3 (D. Conn. June 27, 2013) (internal quotation marks omitted). The court

also retains discretion to "reserve judgment until trial, so that the motion is placed in the appropriate factual context." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 476 (S.D.N.Y. 2009) (internal quotation marks omitted).

## III.    DISCUSSION

### A.  Admissibility under Rule 702

Federal Rule of Civil Procedure 702 requires a district court judge to perform a critical "gatekeeping role" with respect to expert evidence. *See Daubert*, 509 U.S. at 597; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, (1999) ("We conclude that *Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.") (internal citations omitted)).

Under Rule 702,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. In short, the expert's testimony must be relevant, reliable, and have a factual basis.

Rule 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance. 'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Daubert*, 509 U.S. at 591 (citations omitted). Evidence is relevant if it has any tendency to make

the existence of a fact that is of consequence in determining the action more probable or less probable than it would be without the evidence. *See* Fed. R. Evid. 401.

Furthermore, the Supreme Court has held that although "[t]rained experts commonly extrapolate from existing data," neither *Daubert* nor the Federal Rules of Evidence require "a district court to admit opinion evidence ... connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213–14 (2d Cir. 2009) (citation omitted).

But "the Rule 702 inquiry [is] 'a flexible one,'" and "*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'" *Kumho*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 594, 593). "And *Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Id.* at 150 (quoting *Daubert*, 509 U.S. at 591).

Significantly, the proponent of expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp.*, 571 F.3d at 213–14 (citations and quotation marks omitted).

Mr. Lopez does not challenge the State Lab's policies and procedures, nor does he challenge the use of STRmix to analyze the results. Mot. at 17 ("[Mr. Lopez] is not challenging the foundational validity for mixtures up to four contributors (the limits of the State Lab's

validation for case work) or the algorithms and models that undergird STRmix's probabilistic analysis."). Rather, he argues that Mr. Bryant did not properly apply these "principles and methods to the facts of the case," *see* Fed. R. Evid. 702, because he underestimated the NOC and improperly applied STRmix to a mixture that likely contained at least five contributors. Mot. at 17. Specifically, he argues that Mr. Bryant's assessment did not consider "that "#1-5 and #1-6 are low-template (low DNA quantity) profiles with an enhanced risk of drop out," which suggests that "the analyst should not have used the NOC Macro created by the State Lab to select the number of contributors," and that the correct NOC determination is at least five. *Id.* at 15–16. He argues that thus "the STRmix results should be excluded because the State Lab's own validations and SOPs show that STRmix has not been properly validated for use with a mixture with [five or more] contributors." *Id.* at 9–10.

In response, the Government argues that because Mr. Lopez "does not challenge the methods and protocols that Bryant used to formulate his interpretation of the data," his "challenge goes to the weight, not the admissibility, of Bryant's opinion." Opp'n at 8–9. The Government also contends that "DNA samples analyzed in this case represent normal mixtures regularly processed by the State Lab" and "the sample size analyzed here was not unusually low and that the lab frequently amplifies and interprets DNA profiles generated from significantly smaller quantities of DNA."[2] *Id.* at 13.

_____

[2] The Government also argues that "the Connecticut State Lab has internally validated STRmix for use with five-person mixtures" and while "analyzing a five-person mixture as a four-person mixture carries the risk of falsely excluding low-level true contributors[,] . . .this approach does not increase the risk of falsely including non-contributors." Opp'n at 13. The Court disagrees. As discussed during the Daubert hearing, the State Lab's SOP clearly states that STRmix should not be used when the sample is believed to have more than four contributors. SOP at 13, ECF No. 261-2 at 233. Whether or not underestimating the NOC would lead to a risk of under- or over-inclusion, moreover, is a red herring. Mr. Bryant testified that he would not have run the samples through STRmix and generated a LR if he thought the samples were five-person mixtures. Apr. 1 Tr. at 57 ("Q: If the correct number had been five, right, if you had interpreted five, would that have impacted the likelihood ratio? A: So we don't run five-person mixtures. If we've determined a mixture would be five-person, what would have happened in this case, it would have

In reply, Mr. Lopez argues that "the NOC determination is a threshold, foundational, data-driven assessment that must be reliably determined and applied by a DNA expert in order to properly use probabilistic genotype software with a complex mixture" and "[t]he State Lab failed to do that here[.]" Reply at 2.

The Court disagrees, at least in part.

Mr. Lopez raises two main issues with Mr. Bryant's NOC determination: (1) an alleged failure to account for low-threshold DNA, allelic dropout, and allele sharing, and (2) an alleged misuse of the NOC Macro tool.

"[A]llelic drop-out increases in low-template DNA samples or low-template contributors. This drop-out could result in an underestimated NOC because the computed [maximum allele count] will be too small." NIST May 2024 Article at 48–49. In addition, allele sharing can complicate NOC estimation, and "with more contributors to a mixture, more allele sharing occurs, which increases the complexity and ambiguity of interpretation." NIST Dec. 2024 Article at 8; ECF No. 261-2 at 44. Moreover, "[i]f mixture contributors are close genetic relatives, then even more allele sharing between contributors is expected." *Id.*

Both Mr. Bryant and Dr. Ladd agree that each locus in the 001-005 sample and 20 of the 21 loci in the 001-006 sample contained peaks below the State Lab's stochastic threshold of 500 RFU, and thus the samples at issue were low-template DNA samples likely to contain allelic dropout. *See* Apr. 1 Tr. at 86; Apr. 8 Tr. at 248; *see also* Apr. 1 Tr. at 60 ("Q: And there was

---

been reported out as no comparison, too complex."). Likewise, Dr. Ladd testified that underestimating the NOC may cause a third-party culprit to be excluded from the profile, Apr. 8 Tr. at 238, 250, and thus an inaccurate NOC determination can be unfairly prejudicial to the defendant because it does not account for potentially exculpatory information. *See* Apr. 8 Tr. at 238 ("Q. It would tend to be conservative? A. Well, you are maybe overlooking one situation, one key situation, and that is with a third-party culprit issue. Then lowering the LR would be a big deal there, so it is not inherently the case that it is always a conservative thing, and I would also argue that artificially lowering the LR is not sound science anyhow."); *id.* at 250 ("Q. And you mentioned a third-party culprit, if there was somebody that did handle the item, they would be excluded from the profile by using the incorrect NOC and underestimated NOC? A. Potentially, yes.").

dropout in both Samples 1-5 and 1-6, right? A: I think it was reasonably likely that there was some dropout in those samples."). Both experts agree that while over 100pg of DNA was amplified in both samples, based on the mixture proportions assuming four contributors, most of the contributors are estimated to have less than 100pg of DNA for each sample. For example, Mr. Bryant testified that he amplified 180pg of DNA in the 001-005 sample, Apr. 1 Tr. at 87, which, based on his mixture proportion percentages for four contributors, would result in 91.8pg of DNA for Contributor 1, 55.8pg for Contributor 2, 25.2pg for Contributor 3 and 7.2pg for Contributor 4. *Id.* at 88–89; *see also* Apr. 8 Tr. at 180–81 (discussing how in 001-006 sample three of four contributors were below 100pg target). In addition, both experts testified that allele sharing was possible in this sample. Apr. 1 Tr. at 104 ("Q: You did agree that there was dropout? A. Dropout possible, yes. Q. And possible allele sharing? A. Yes.").

While Mr. Bryant and Dr. Ladd disagree on the best interpretation of the NOC given the possibility of allele sharing and dropout and the low-template DNA sample, both agree, however, that the samples are within the ordinary ranges for the lab to process. Apr. 1 Tr. at 110 ("A. [Mr. Bryant] . . . I mean, I would say that this profile isn't atypical of a complex mixture. Any four-person mixture, when we amplify, our optimal 300 picogram amount is going to have contributors that are below 100 picograms. So that's not unusual. Oftentimes we are dealing with fairly low level of contributors."); Apr. 8 Tr. at 205 ("Q. And the quantities of DNA analyzed here, fair to say that they were sub optimal, in order, below that target threshold, but not out of the ordinary in terms of quantity sizes that the lab analyzes constantly, correct? A. [Dr. Ladd] Correct.").

Moreover, although Dr. Ladd believes he has the better interpretation and that Mr. Bryant did not adequately account for allelic dropout,[3] he does not question that Mr. Bryant's analysis is reasonable. *See* Apr. 9 Tr. at 226–27 ("Q. . . . [I]t is possible, based on this data, that four is the best estimate of the number of contributors? A. [Dr. Ladd] Well, if you are asking with a maximum allele count of seven, is it possible to be explained by four contributors? Yes, it definitely is. . . . Q. In fact, although you think there is a better estimate than four, four is a reasonable view of this data, correct? A. I mean, I'm -- I think I have categorized it how I feel about it. Q. Well, I will just ask the question, yes or no, you believe it is a reasonable, albeit inferior to your own view, assessment of this data? A. Okay. Q. That is a yes? A. Yes."). There is no evidence that Mr. Bryant failed to follow proper protocols or methods to account for allelic dropout and sharing while conducting his analysis; rather, his testimony suggests that he followed the protocols set forth in the SOP and described in Dr. Ladd's testimony as the proper method for NOC determination. *See, e.g.,* Apr. 1 Tr. at 75–76 (Mr. Bryant explains how he accounted for allelic dropout); *id.* at 104 (Mr. Bryant explains how he accounted for DNA degradation); *compare* SOP at 10–11, ECF No. 261-2 at 230–31; Apr. 9 Tr. at 214 ("A. [Dr. Ladd] Well, not specifically the FGA always, but in this particular case, absolutely, the analysis would start with FGA. Q. So Mr. Bryant wasn't out of line or unusual in starting there. That is, in fact, what the protocol would tell him to do? A. I completely agree with him starting there. . . Q. . . . . [T]he number of contributors indicated by the maximum allele count could actually be the best estimate of NOC? A. It could be the correct estimate, yes. Q. But it is important to review the profile as a whole, right? A. Yes."); *with* Apr. 1

---

[3] While the Government also presented evidence at the Daubert hearing that the State Lab's new NOC Macro tool, which does account for dropout, likewise supports a NOC determination of four contributors, this evidence is outside the scope of Mr. Lopez's challenge to the methods applied in 2020, and the Government has failed to establish that this new macro has gained widespread acceptance in the scientific community as a reliable tool for DNA analysis.

Tr. at 82 (Mr. Bryant explains that his "analysis of four persons is based upon an analysis of the entire profile, not just this one of 21 loci").

As for the NOC Macro tool, Mr. Bryant testified that he "didn't rely on the [NOC] macro to make [his] assessment." Apr. 1 Tr. at 95. As discussed above, because the testimony at the Daubert hearing suggests that many loci present a risk of allelic dropout, Mr. Bryant followed the lab's protocols through not relying upon the NOC Macro, as the instructions for its use indicate that "[i]f dropout is expected at most loci, there is no need to run the macro as this tool will not likely add value beyond visual examination." Def. Exhibit 7. Mr. Bryant thus properly applied this protocol through relying on his visual examination of the electropherograms rather than the NOC Macro's estimation.

As a result, while Dr. Ladd suggests that another reasonable interpretation of the NOC is possible, his testimony and the analysis underlying it are not sufficient to show that Mr. Bryant misapplied reliable and established policies and protocols in reaching his NOC determination here. *See Green*, 2024 WL 4488577, at *2 ("[W]hile the technician's decision required judgment, it was not arbitrary. The analyst followed the lab protocols. Based on this record, the district court did not err in finding that the minimum number of DNA contributors is determined through a scientific process, not – as Green asserts – on the basis of a technician's whims.").

Mr. Lopez claims that "the court in *Ortiz* faced a similar situation and concluded that its gatekeeping function required a careful assessment of the NOC issue, notwithstanding the competing versions offered by the witnesses." Mot. at 18. In *Ortiz*, however, the Government's expert relied on an analysis that relied upon disregarding stutter peaks and discounted a high risk of allele sharing, and as a result the court found that the NOC determination of five was unreliable, and the sample could have a NOC of at least six.

In *Ortiz*, "the electropherogram displayed twelve peaks, which indicates a NOC of at least six" but the Government's expert "testif[ied] that in his judgment, one of the twelve peaks was an artifactual product of stutter, and the other an artifactual product of 'spectral pull-up[,]'" and thus the sample only displayed ten peaks, indicating a NOC of at least five. *Ortiz*, 736 F. Supp. 3d at 903. The court found that "[e]ven if Mr. Dutra correctly concluded that the electropherogram displayed only ten peaks, allelic sharing suggests that those peaks underrepresented the true number of alleles in the sample[,]" given that "evidence in the record demonstrates that the sample may have contained DNA from related individuals." *Id.*

Here, by contrast, Mr. Bryant and Dr. Ladd agree that the electropherogram for each sample displays seven peaks at its highest locus, resulting in a minimum number of contributors of four. Apr. 1 Tr. at 52–53; Apr. 8 Tr. at 184. This analysis of the minimum NOC is likewise supported by the State Lab's SOP, which states that "[d]etermination of the number of contributors to a profile begins with assessing the minimum number of contributors from the locus that exhibits the greatest number of allelic peaks," SOP at 9, ECF No. 261-2 at 229; *see also id.* ("For example, if at most five alleles are observed at a locus, then the DNA results are consistent with having arisen from at least three individuals."), and it is likewise consistent with protocols for NOC estimation at other forensic labs. *See, e.g., Green*, 2024 WL 4488577, at *2 ("'If the maximum number of alleles is an odd number, the value is rounded up.' So, for example, 'if at most [seven] alleles are detected per locus, the resultant minimum number of contributors will be [four].'" (alterations in original) (citations omitted)).

Moreover, there is no evidence that the sample contained DNA from close relatives that would increase the risk of allele sharing, as was the case in *Ortiz*. *See Ortiz*, 736 F. Supp. 3d at 905 ("The facts of this specific case—including . . . the heightened risk of related contributors . . .

and the failure to account for related individuals in close proximity to the firearm—indicate a significant likelihood that NOC was six or greater."). As a result, the unique factors at issue in *Ortiz* that complicated the analysis of the DNA evidence there are not present here. *See id.* at 904–05 ("If [the NOC determination] is in doubt, the reliability of the entire analysis is necessarily in doubt . . . . In this case, Mr. Dutra's NOC determination is placed in doubt given the twelve identified alleles and a small DNA sample size which was degraded due to repeated testing, increasing the likelihood of allelic dropout. In addition, the likely stochastic effects of allele sharing were not taken into account given the fact that Mr. Dutra was unaware that there were two related passengers in close proximity to the firearm in the vehicle.").

And, while *Walker v. City of New York* involved evidence generated by the Office of the Chief Medical Examiner's Low Copy Number testing and Forensic Statistical Tool from an unusually low amount of DNA—merely 22.35pg—the sample at issue there "was below 100 pg" and "no distinct (or 'major') DNA profile could be deduced from the sample." No. 14-CV-680 (NRM) (PK), 2024 WL 4198451, at *1 (E.D.N.Y. Sept. 16, 2024) at *1–2. By contrast, here, the 001-005 sample amplified 180pg of DNA and the 001-006 sample amplified 240pg of DNA, *see* Def. Exhibit 4 at 1, Def. Exhibit 5 at 1, and while, estimating four contributors, several contributors had less than 100pg of DNA, Mr. Bryant testified that there were "two more major components in the mixture." Apr. 1 Tr. at 76 ("I thought the profile was consistent with having two more major contributors, profiles that perhaps were, you know, not quite in the sub-stochastic area or closer to not being in the sub-stochastic kind of threshold area.").

Apart from the differences in the qualities of the samples, the *Walker* case did not involve the use of STRmix, and instead considered the Office of the Chief Medical Examiner's methods and tools, which the court determined could not reliably estimate contributors for a DNA mixture

below 25pg. *Walker*, 2024 WL 4198451, at *11. By contrast, here, Mr. Bryant and Dr. Ladd agree that the State Lab, whose policies and protocols both parties agree are reliable, routinely analyzes low-template DNA samples in quantities similar to those analyzed here. *See* Apr. 1 Tr. at 110 (Mr. Bryant: "I would say that this profile isn't atypical of a complex mixture."); Apr. 8 Tr. at 205 ("Q. And the quantities of DNA analyzed here, fair to say that they were sub optimal, in order, below that target threshold, but not out of the ordinary in terms of quantity sizes that the lab analyzes constantly, correct? A. [Dr. Ladd] Correct."). As a result, the issues raised in *Walker* are not applicable to the protocols and policies at issue here.

Accordingly, the Government has presented sufficient evidence that this DNA testimony is probative evidence that "is based on sufficient facts or data," "the product of reliable principles and methods," and that Mr. Bryant's "opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Mr. Lopez, therefore, raises issues that go to the evidence's weight, not its admissibility under Rule 702. *See United States v. Jones*, 965 F.3d 149, 162 (2d Cir. 2020) ("A decision to admit [expert testimony] can be manifestly erroneous, for example, if the 'expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached,' . . . or if the opinion 'is speculative or conjectural, . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison[.]' But 'other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.'" (citations omitted)).

### B.  Admissibility under Rule 403

"In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury.'" *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (quoting Fed. R. Evid. 403). Expert evidence—particularly on the topic of DNA—can be "both powerful and quite misleading" and that the court must, "in weighing possible prejudice against probative force under Rule 403 . . . exercise[] more control over experts than over lay witnesses." *See Daubert*, 509 U.S. at 595; *see also People v. Wright*, 37 N.E.3d 1127, 1137 (N.Y. 2015) ("The persuasiveness of DNA evidence is so great that as one commentator noted, '[w]hen DNA evidence is introduced against an accused at trial, the prosecutor's case can take on an aura of invincibility.'" (citation omitted) (alteration in original)). "However, the damaging nature of the DNA evidence to defendants and the potential prejudice does not require exclusion." *United States v. Bonds*, 12 F.3d 540, 568 (6th Cir. 1993).

Mr. Lopez argues that even if this DNA evidence is admissible under Rule 702, it should be excluded under Rule 403 "[d]ue to the power of the DNA evidence, and the complicated nature of pointing out the flaws in the State Lab's approach to the NOC issue." *Id.* at 23.

The Government argues that the evidence would not be unduly prejudicial, and that "it is for the jury to weigh those competing views, or to consider the government's expert's opinion alongside any doubts elicited on cross examination." *Id.* at 16–17.

The Court agrees, at least in part.

The DNA evidence here provides support for the Government's theory that Mr. Lopez was present at the scene of the Ansonia robbery and is highly probative. Thus, the Court must consider whether its probative value is outweighed by the risk of unfair prejudice, confusion of the issues, or misleading the jury.

In *Ortiz*, the court concluded that even if the evidence were admissible under Rule 702, it would nonetheless be excluded under Rule 403 because neither the Government nor the defense's

experts "considered the likelihood of allelic stacking based upon two close relatives being in close proximity to the firearm at any time before or after their determination of NOC," and therefore "it will be up to the jury, unguided by the experts, to determine what effect these omitted facts have on the NOC determination." *Id*. at 909–10.

Here, however, both parties' experts have competing theories on how to analyze the relevant factors complicating the NOC determination, and the jury need only determine which expert's analysis is more credible. Under such circumstances, the resolution of reasonable but conflicting expert testimony is best left for the jury. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Campbell ex rel. Campbell v. Metropolitan Property & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (arguments regarding gaps or inconsistencies in an expert's reasoning, or different interpretations stemming from the testimony, "go to the weight of the evidence, not to its admissibility").

But the Government may argue at trial that, even if the jury found that the NOC determination should have been five contributors, rather than four, STRmix's results were still sufficiently conservative that the jury could conclude the DNA evidence nonetheless establishes Mr. Lopez is a contributor to the DNA samples. *See, e.g.,* Apr. 1 Tr. at 23 ("Q. [Government] So I want to ask you, in the unlikely event that there are five number of contributors instead of what was initially interpreted as four, would this lead to a false elimination or a false inclusion of a person's DNA in the mixture?"). This argument, however, is contrary to the State Lab's own protocols against generating likelihood ratios for complex mixtures containing five or more contributors. *See* SOP at 13, ECF No. 261-2 at 233 ("STRmix is unable to be run to obtain a

likelihood ratio to a deconvolution from a questioned sample. There are 2 reasons for this: . . .The mixture too complex. With > 4 unknown (unconditioned) contributors, or when the analyst is unable to determine the number of contributors with confidence.").

Thus, it would be unfairly prejudicial to Mr. Lopez for the Government to argue that the jury may nevertheless conclude that he was a contributor if the correct NOC were five rather than four, because under the State Lab's SOP, Mr. Bryant would never have computed a likelihood ratio or compared Mr. Lopez's DNA to the samples and generated results suggesting Mr. Lopez was a contributor if the correct NOC were five. *See* Apr. 1 Tr. at 57 ("Q. If the correct number had been five, . . . would that have impacted the likelihood ratio? A. So we don't run five-person mixtures. If we've determined a mixture would be five-person, what would have happened in this case, it would have been reported out as no comparison, too complex.").

Likewise, any evidence related to the State Lab's new NOC Macro is not only irrelevant to Mr. Bryant's analysis in 2020—before this tool was created—but also improper given that the Government has failed to establish that this evidence is the "product of reliable principles and methods" and is admissible under Rule 702. *See* Apr. 1 Tr. at 62–63 ("Q. Does any other lab in the country use this macro that's the new macro that you've been talking about? A: Not that I know of. Q: Do you know whether it's been presented at any national conferences in the forensic community? A: Not that I know of. It could have been, but I don't know.").

Accordingly, while the Government may present the results of Mr. Bryant's 2020 DNA analysis, it may not introduce evidence that, even if the correct NOC determination were five, reliance on the DNA testing results generated here would nonetheless be proper. Nor may it present evidence that Mr. Bryant's NOC determination is supported by newer tools developed after his original analysis. *See* Fed. R. Evid. 403 (Relevant evidence may be excluded "if its probative value

is substantially outweighed by a danger of . . . unfair prejudice, . . . [or], misleading the jury.*");*

*see also Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 327 (2d Cir. 1986) ("[Rule 403] grants

the trial judge broad discretion to determine whether to allow the introduction of relevant, but

prejudicial, matters into evidence.").

## IV.     CONCLUSION

For the foregoing reasons, the motion *in limine* to exclude DNA evidence is **GRANTED**

**in part and DENIED in part**.

**SO ORDERED** at New Haven, Connecticut, this 15th day of April, 2025.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE